**Carol DIAMENT, Appellee**

v.

**John DIAMENT, Appellant.**

**Carol Diament, Appellant**

v.

**John Diament, Appellee.**

Superior Court of Pennsylvania.

Submitted Oct. 29, 2002.
Filed Jan. 23, 2003.

Albert M. Afonso, Cinnaninson, NJ, for John Diament.

Nancy J. Shahmirzadi, Jenkintown, for Carol Diament.

Before: JOHNSON, BENDER, and KELLY, JJ.

KELLY, J.

¶ 1 The parties to these consolidated appeals and cross-appeals ask us to determine, *inter alia,* whether the trial court erred on several issues involved in entering the divorce decree between John Diament ("Husband") and Carol Diament ("Wife"), including the court's determination that Wife's lump sum personal injury settlement was not a marital asset subject to equitable distribution. We are also asked to determine whether the trial court properly calculated the spousal and child support obligations of the two parties. We hold that the trial court properly classified Wife's personal injury settlement as non-marital property. We also hold that the court erred in its calculations of the parties' spousal and child support obligations. Thus, after careful review of all the issues raised by the parties, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

¶ 2 The relevant facts and procedural history of this case are set forth accurately

in the trial court's Opinion and Final Order Decree, as follows:

[Wife] and [Husband] were married on September 7, 1980 and separated in August of 1993. It was the parties' first marriage. They had two children: Evan, born February 25, 1982 and Elizabeth, born May 16, 1984. Wife filed a Complaint in Divorce on February 12, 1996. Wife was born April 8, 1951 and has a high school diploma and has taken several college courses. Husband was born on June 27, 1953, has a high school diploma and spent one year at Philadelphia College of Textiles and Science.

Husband is a builder of up-scale custom homes in Chester County. Prior to 1992, Husband operated his business as John B. Diament Builder, Inc. In 1992, Husband incorporated Diament Building Corp. Since 1992, Diament Building Corp. builds the homes and John B. Diament Builder, Inc. acquires the land which can be used for residential construction.

Wife obtained her real estate agent's license in 1975 and obtained her real estate broker's license in 1979. She testified that after her children were born, she stopped working to stay home with them full time. The real estate licenses are currently being held in escrow. Wife is also a licensed esthetician. She testified that she has an injury to her thumb, which interferes with her ability to work as an esthetician. In 1995 Wife operated her own business known as Carol's Total Skin Care. She has worked as a landscaper and taken courses in landscaping at Temple University and Longwood Gardens. She also worked in the catering business until June of 1998. On December 31, 1997, Wife received a lump sum personal injury settlement in the net amount of $343,857.33. . . .

(Trial Court Opinion and Final Order Decree, dated June 18, 2001, at 1–3) (citations to notes of testimony omitted).

¶ 3 On July 3, 1997, the Honorable Alexander Endy entered a support order detailing the child and spousal support obligations of both parties. The net result of this determination was Husband's duty to provide $3,600 per month to Wife as spousal support. Both parties filed for modifications of this order, and hearings were held on September 28th and 29th, 1999.

¶ 4 In an order and opinion dated December 8, 1999, Judge Endy decreased Husband's monthly spousal support obligation to $2671. This calculation took into consideration the increased earning capacity of both parties. Husband's yearly earnings increased during 1998, and Wife received $343,857 in net proceeds from a personal injury settlement. The court also held the settlement was income available for Wife's child support obligations, and applied the projected earned interest on the settlement toward her yearly earnings for purposes of the support calculations.

¶ 5 In response to Wife's petition to reconsider, Judge Endy entered a new opinion on February 3, 2000. This opinion recalculated Wife's monthly earnings, admitting it had mistakenly included Husband's spousal support payments in the calculation in its previous order. Also, the court adjusted the reasonable needs of the children to comport with the increase in the "presumptive minimum" of support under the newly-amended guidelines. The court set Husband's obligation to Wife at $3,277 per month. Both parties appealed.

¶ 6 The appeals were consolidated, briefed, and argued to this Court, but in an opinion dated March 8, 2001, this Court held the support orders were interlocutory, pending the entry of a final divorce and equitable distribution decree. *See Diament v. Diament*, 771 A.2d 793 (Pa.Su-

per.2001) (holding all claims concerning spousal support modifications were interlocutory, and order denying child support modification was interlocutory where custodial parent had significant financial resources; children not at risk regarding support; equitable distribution issues intrinsically intertwined with support issues). Therefore, the appeals were quashed.

¶ 7 On June 18, 2001, the Honorable Katherine B.L. Platt of the Chester County Court of Pleas entered a final divorce decree in this matter. Both parties appealed. In a Rule 1925(a) statement dated August 16, 2001, Judge Platt responded that her June 18, 2001 opinion and final order had adequately disposed of all matters complained of on appeal. The parties have also raised their previous support issues in these appeals from the final decree.

¶ 8 At appeals No. 1743 EDA 2001 and No. 222 EDA 2001, Appellant raises the following issues for review [1]:

1. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN RULING THAT THE LUMP SUM PERSONAL INJURY SETTLEMENT RECEIVED BY THE WIFE WAS NOT SUBJECT TO EQUITABLE DISTRIBUTION[?]

2. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN THE CHARACTERIZATION AND ALLOCATION OF [HUSBAND'S] PAYMENT OF [WIFE'S] MEDICAL BILLS AND LIVING EXPENSES PRIOR TO THE EFFECTIVE DATE OF A SUPPORT ORDER IS PROPER[?]

3. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN THE CHARACTERIZATION OF FUNDS SPENT BY [HUSBAND] FOR THE EDUCATION OF THE PARTIES' TWO MINOR CHILDREN IN FRANCE AS A PREDISTRIBUTION OF MARITAL ASSETS[?]

4. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN COMPUTING [WIFE'S] DISSIPATION OF THE PARTIES' VANGUARD ACCOUNT AT ONLY $19,000[?]

5. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN THE ALLOCATION OF RENTAL PROCEEDS RELATED TO THREE MARITAL PROPERTIES[?]

6. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN THE AWARD OF ATTORNEY'S FEES AND COSTS TO [WIFE][?]

7. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN INCLUDING A LOAN RELATED TO THE MARITAL BUSINESS AS AN ASSET AVAILABLE FOR EQUITABLE DISTRIBUTION[?]

8. [DID] THE [TRIAL] COURT ABUSE ITS DISCRETION IN FASHIONING AN OVERALL DISTRIBUTION SCHEME THAT WAS INAPPROPRIATE UNDER THE CIRCUMSTANCES[?]

9. [DID] THE TRIAL COURT ABUSE ITS DISCRETION BY ASSIGNING AN UNREASONABLY LOW EARNING CAPACITY TO WIFE [?]

10. [DID] THE TRIAL COURT ABUSE ITS DISCRETION IN ABSOLVING WIFE'S INESCAPABLE

1. For ease of disposition, we have taken Husband's issues on appeal from his Table of Contents, which more accurately corresponds to the arguments he raises in the argument section of his appellate brief.

DUTY AS A PARENT TO CONTRIB-
UTE FINANCIALLY TO THE SUP-
PORT OF HER TWO CHILDREN[?]

11. [DID] THE TRIAL COURT
ABUSE ITS DISCRETION IN RE-
QUIRING HUSBAND TO PROVIDE
HEALTH INSURANCE COVERAGE
FOR WIFE AND HIS MINOR CHIL-
DREN AT HIS SOLE EXPENSE
AND ASSIGNING HUSBAND 100%
RESPONSIBILITY FOR THE UN-
REIMBURSED MEDICAL EX-
PENSES OF WIFE AND THEIR
CHILDREN[?]

12. [DID] THE [TRIAL] COURT
ABUSE ITS DISCRETION IN
TREATING WIFE'S NET TORT SET-
TLEMENT PROCEEDS OF
$343,857.33 AND SPECIAL RELIEF
AWARD OF $35,000 AS NEITHER IN-
COME AVAILABLE FOR CHILD OR
SPOUSAL SUPPORT[?]

(Husband's Brief at i-ii).

¶ 9 In her cross-appeals at No. 1827
EDA 2001 and 2222 EDA 2001, Wife raises
the following issues:

1. DID THE TRIAL COURT FAIL
TO PROPERLY APPLY THE COR-
RECT COMPUTATIONAL SE-
QUENCE UNDER THE GUIDE-
LINES WHEN CALCULATING THE
PARTIES' SPOUSAL AND CHILD
SUPPORT OBLIGATIONS TO EACH
OTHER?

2. DID THE TRIAL COURT'S ADDI-
TION OF $35,000 TO THE UNDIS-
PUTED AMOUNT OF WIFE'S NET
MALPRACTICE SETTLEMENT
AWARD, AND HIS DOUBLE-
COUNTING OF A PORTION OF THE
INTEREST EARNED BY WIFE ON
THAT AWARD, RESULT FROM A
CAPRICIOUS DISREGARD OF UN-
CONTRADICTED EVIDENCE, RE-
QUIRING REVERSAL OF THE SUP-
PORT ORDER?

3. DID THE TRIAL COURT ABUSE
ITS DISCRETION BY DISREGARD-
ING COMPETENT, CREDIBLE EVI-
DENCE–INCLUDING HUSBAND'S
OWN ADMISSIONS OF ADDITION-
AL INCOME ATTRIBUTABLE TO
HUSBAND OVER AND ABOVE THE
AMOUNTS IMPUTED BY THE
COURT?

4. DID THE TRIAL COURT ERR AS
A MATTER OF LAW BY FAILING
TO CALCULATE AND ADD BACK
INTO INCOME THE TAX SAVINGS
HUSBAND WILL ENJOY AS A RE-
SULT OF HIS SPOUSAL SUPPORT
PAYMENT TO WIFE?

(Wife's Brief at 1).

¶ 10 In general, this Court will not
disturb a trial court's equitable distribution
order absent an abuse of discretion or
error of law that is demonstrated by clear
and convincing evidence. *Gilliland v. Gil-
liland*, 751 A.2d 1169 (Pa.Super.2000).
Under this standard of review,

[w]e do not evaluate the propriety of the
distribution order upon our agreement
with the [trial] court's actions nor do we
find a basis for reversal in the court's
application of a single factor. Rather,
we look at the distribution as a whole, in
light of the [trial] court's overall applica-
tion of the [23 Pa.C.S.A. § 3502(a) ] fac-
tors. If we fail to find an abuse of
discretion, the [o]rder must stand. The
factors to be considered in making an
equitable distribution are set forth in 23
Pa.C.S.A. § 3502(a)(1–11). Our review
of the . . . court's distribution is necessar-
ily limited to a determination of whether
in light of the entire distribution, consid-
ering all the factors set forth by the
legislature, an abuse of discretion oc-
curred.

*Id.* at 648–49.

¶ 11 Our scope of review of a
spousal support order is similarly limited;

we will reverse a trial court's order only where it cannot be sustained on any valid ground. *McKolanis v. McKolanis*, 644 A.2d 1256, 1257 (Pa.Super.1994). This Court will not interfere with the broad discretion afforded the trial court, absent an abuse of discretion or insufficient evidence to sustain the support order. *Id.* An abuse of discretion exists where the trial court has overridden or misapplied the law. *Diehl on Behalf of Beaver v. Beaver*, 444 Pa.Super. 91, 663 A.2d 232, 233 (1995). Although the trial court should give great weight to the conclusions of the Master, we are limited to a review of the trial court's decisions, not those of the Master. *McNaughton v. McNaughton*, 412 Pa.Super. 409, 603 A.2d 646 (1992).

¶ 12 Likewise, our standard of review in a child support case is as follows:

> The amount of a support order is largely within the discretion of the trial court, whose judgment should not be disturbed on appeal absent a clear abuse of discretion. An abuse of discretion is not merely an error of judgment, but rather a misapplication of the law or an unreasonable exercise of judgment. A finding that the trial abused its discretion must rely upon a showing by clear and convincing evidence, and the trial court will be upheld on any valid grounds.

*Portugal v. Portugal*, 798 A.2d 246, 249 (Pa.Super.2002).

¶ 13 Husband first challenges the distribution of Wife's personal injury settlement, which allotted 90% of the proceeds to Wife. Husband believes this distribution error stems from the Master's improper characterization of Wife's settlement proceeds as both marital and non-marital property. Husband contends this

mischaracterization led to a distribution inconsistent with the trial court's fifty-percent proposed distribution scheme. He also submits the trial court failed to consider the settlement proceeds as available income when calculating the support obligation.[2] Thus, Husband concludes the trial court abused its discretion in deciding the distribution of Wife's personal injury settlement to Wife. We disagree.

¶ 14 It is of no moment whether the master's recommendation erroneously split Wife's settlement property into marital and non-marital components. We may only review the analysis of the trial court, which appropriately determined Wife's cause of action accrued after the separation and was not marital property subject to equitable distribution. *See McNaughton, supra.* In deciding how to classify the settlement proceeds, Judge Platt provided the following astute and well-reasoned analysis:

> Husband asserts that the entire settlement award is marital property and should have been awarded 50/50 consistent with the overall distribution scheme set forth in the Master's Recommendation. Husband argues that because the [treatment giving rise to Wife's law suit] commenced during the parties' marriage, the cause of action accrued during the marriage, making the settlement marital regardless of when the proceeds were received. And as the balance of the marital estate was divided 50% to each, this asset should be similarly handled.

> Wife argues that the settlement award is entirely non-marital and therefore not subject to distribution. While acknowledging that Wife did receive "treatment" during the marriage as well as post-

---

**2.** This argument appears in Husband's issue twelve. Because it is an elaboration of Husband's first argument, it is addressed here.

separation, the cause of action did not accrue until Wife realized in 1995 that she had been the victim of malpractice. Because that accrual and the payment were both post-separation, the asset falls within the exception articulated by § 3501(a)(8), in Wife's view.

We are aware of no Pennsylvania appellate authority dealing with a timing pattern such as presented here. . . .

\* \* \*

■ Thus we come to the key question: when did Wife's malpractice action accrue? Neither the Divorce Code nor the Judicial Code [42 Pa.C.S.A. 101] defines the term "accrue." According to the Supreme Court in [*Drake v. Drake*, 555 Pa. 481, 725 A.2d 717 (1999)], "to find whether an award...is marital property under Section 3501(8), we must first evaluate when the right to receive the payment arose." [*Id.* at 499, 725 A.2d at 726.] The right to receive payment is necessarily a consequence of sustaining a cause of action.

Wife asserts that even if the facts would have entitled her to sustain an action prior to separation, her ability to sue did not arise until she discovered in 1995 that she had been wronged. Wife correctly points out that in medical malpractice cases the two year statute of limitations under 42 Pa.C.S.A. § 5524 may not begin to run until discovery of the wrongdoing. . . .

Instantly, Wife sued her former psychologists for injuries relating to the treatment she received in therapy with Genesis Associates. In a hearing in this Court on May 30, 2001, Wife testified that she began counseling with Genesis Association in June of 1989 prior to the parties' separation. Husband joined her in the counseling sessions and they each also had individual counseling sessions. In late 1992, Wife thought about discon-

tinuing her therapy with Genesis Associates because she thought things were improving. In fact, she started taking classes with Genesis to prepare her for the end of counseling. Wife testified that for the next six months, the counselors at Genesis persuaded her to continue therapy. In July or August of 1993, the Genesis counselors told Wife that she had to leave her family for the sake of their safety. Wife left the marital residence in August of 1993, the date of separation. She expected that she would not be permitted to see her children for a two year period.

She continued treatment with Genesis after leaving the marital residence. In August of 1994, Wife had a breakdown and was hospitalized for six weeks in New Orleans. Although Wife treated with other therapists, she continued to have counseling sessions by phone with Genesis. In the summer of 1995, Wife moved to Oregon and realized that the treatment she received from the Genesis counselors was unethical. She telephoned Patricia Mansman, her Genesis counselor to say she was ready to see her children and was told that she could not see them until they were adults. It was at this point that [Wife] knew not only that the "treatment" had been unethical but that she had been profoundly harmed by it. She thereafter terminated treatment with Genesis Associates in September of 1995 and filed suit against the Genesis Associates in July of 1996. Husband did not support Wife's claims and in fact testified at depositions on behalf of Genesis. The case settled, however, and [W]ife received net settlement proceeds of $343,857.33 in December of 1997.

Because her case involved a psychological injury, as opposed to a physical injury, it is difficult to determine when the

harm occurred and when Wife became aware of "the salient facts" that gave rise to the cause of action. Wife testified that when she told the Genesis counselors that she wanted to discontinue treatment, the counselors beat down her self-esteem and told her that she had multiple personalities. She was so connected to the Genesis counselors that therapists at the hospital in New Orleans believed that if they told her that the Genesis counselors were unethical, she would discontinue treatment with the hospital therapists, thus thwarting her recovery.

In this situation, while Wife lived in the marital residence the Genesis counselors prevented Wife from knowing the salient facts regarding her mistreatment at their hands.

The Honorable Lawrence Wood of our Court encountered a somewhat analogous set of circumstances in *Scherbner v. Abbott Laboratories, Inc.*, 24 Pa.D. & C.4th 108 (1995). In that case, the Scherbners were married in 1986. In 1990 they filed suit against drug manufacturers alleging that Mrs. Scherbner had been rendered infertile because her mother had taken the drug DES while pregnant. They learned of the injury shortly before filing suit. Settlement was reached in 1992, but not funded. Mrs. Scherbner filed for divorce in 1993 and petitioned the Court to declare the settlement her separate property on the theory that the cause of action accrued when she was *in utero*, i.e. many years before her marriage. Therefore, Wife claimed it fell within the § 3501(a)(8) exception to marital property.

Judge Wood noted "our courts have consistently held that a cause of action 'accrues' when the defendant's negligent conduct becomes known or should have become known to plaintiff." *Id.* at 111, citing *Saft v. Upper Dublin Township,*

[161 Pa.Cmwlth. 158] 636 A.2d 284 (Pa. Cmwlth.1993) which cites *Stein v. Richardson,* [302 Pa.Super. 124] 448 A.2d 558 (Pa.Super.1982). Because Mrs. Scherbner discovered her infertility while married to Mr. Scherbner, Judge Wood determined that her cause of action had accrued during her marriage, and settlement, therefore was marital property.

[In the instant case] Wife persuades us that the harm she incurred was the destruction of her family, particularly the loss of a relationship with her children. At the earliest point, that loss was incurred at the very time Wife moved out of the marital residence at the direction of Genesis. At the latest the cause of action arose in 1995 when she became aware of not only...how she had been maltreated, but the harm which resulted. Thus, by either reckoning the cause of action accrued post-separation and is not marital property subject to equitable distribution.

Husband also contends the 90%–10% distribution of Wife's personal injury award creates an unaccounted-for overpayment of spousal support by Husband. We presume that our having found the entire award to be non-marital would redouble his concern in this regard. He claims that Judge Endy's Support Order failed to include the *corpus* of the settlement proceeds and recalculated Wife's net income to include that imputed interest income. The fact that that asset is now determined to be Wife's separate asset does not in and of itself entitle Husband to an adjustment against his support. Judge Endy carefully reviewed the appellate case law and exercised the discretion accorded to him as trial court pursuant to Pa.R.C.P. 1910.16–2(a)(8). The result reached was a fair one and we need not "adjust" any

portion of support or equitable distribution award as a result.

(Trial Court Opinion, dated June 18, 2001, at 9–16) (some internal citations omitted). The trial court performed an exhaustive search of the record and supports its decision with sound legal reasoning. Moreover, this Court has recently held that an enforceable right to an award for personal injury does not accrue at the time of the injury, but reaches fruition only upon the entry of a verdict or settlement. *Pudlish v. Pudlish,* 796 A.2d 346 (Pa.Super.2002). Although the husband in *Pudlish* was injured during the course of his marriage, his settlement award for this injury was not considered a marital asset because his enforceable right to the award, triggered by the settlement of his case, accrued after the parties' separation. *Id.* at 350. Here, both Wife's injury **and** her settlement occurred subsequent to the parties' separation. Therefore, under no circumstances could her enforceable right to the personal injury award be subject to equitable distribution.[3] *See id.* Thus, we conclude the court properly found Wife's settlement was non-marital property, and applied only Wife's imputed interest from the settlement towards the parties' support obligations. *See Portugal, supra; Gilliland, supra; McKolanis, supra.*

¶ 15 Next, Husband argues his payment of Wife's medical bills while she was in treatment in New Orleans should have been considered a predistribution of marital funds. Husband contends the trial court's first order of spousal support, which required him to pay one-half of Wife's unreimbursed medical expenses, was not yet in effect when he paid for Wife's treatment. Similarly, Husband believes the approximately $60,000 he spent with his children during a 1994 French vacation should have been considered a predistribution of marital funds. He argues the payment should have been deducted from the marital estate because it benefited the children, who were enrolled in a Paris school, and had been approved by Wife. Thus, Husband concludes the trial court abused its discretion in failing to characterize these two payments as a predistribution of marital funds. We cannot agree.

¶ 16 The trial court disposed of Husband's New Orleans medical expenses argument as follows:

Husband contends that the Special Master erred when she based her decision on the Support Order issued by Judge Endy requiring him to pay 100% of Wife's unreimbursed medical bills. He claims that since the Support Order was not effective until August 22, 1996, all payments made by Husband to and on behalf of Wife should be considered as the predistribution of marital assets.

In response, Wife asserts that Husband's argument implies that since a support order may not be enforced retroactively, it necessarily follows that payments made for the support of a spouse in the absence of such an order cannot be in the nature of support. She contends that Husband has no valid claim for any credit based on his support to Wife while in New Orleans because it

---

3. *Pudlish* provides sound reasoning on this issue, because the enforceable right to recover legally for an injury accrues upon verdict or settlement. Only at that point does the claim have a specific enforceable value. A speculative right to recover for a personal injury is properly withheld from equitable distribution because there is no means by which to assign it a value. If no settlement or verdict has been reached in a spouse's personal injury action prior to the parties' separation, then there is no enforceable claim that can be divided between the parties. It is not logically or practically feasible to subject a speculative right to equitable distribution.

is the law of this Commonwealth that "married persons are liable for the support of each other according to their respective abilities to provide support as provided by law." 23 Pa.C.S. 4321(1). Wife also points out, correctly, that the support rules were expressly designed to allow proceedings to be brought to "enforce" as opposed to **create** a duty of support. Pa.R.C.P.1910.1. The duty is created by the marriage relationship itself. The fact that the extent or nature of support due was not quantified until a later date is of no moment.

(Trial Court Opinion at 19–20) (emphasis in original).

¶ 17 The trial court responded to Husband's arguments regarding the 1994 trip to Paris in the following manner:

The Special Master did not include the cost of the trip to France as a credit or debit to either party in her Report and Recommendation. In Footnote 20 of her Report she states that the payment of the International School in Paris was considered and, according to the evidence, was part of the expenditure of the funds taken from the Vanguard account. Husband withdrew funds from the Vanguard short-term treasury fund and transferred the money to his businesses. The Special Master recommended that the Vanguard Accounts be distributed to Wife and the notes payable from the businesses be distributed to Husband.

Husband seeks to reduce the marital estate by the cost of the Paris trip. In response, Wife asserts that the marital estate may have already been reduced by this sum of money by virtue of Husband's expenditures. This is correct if part of the withdrawal from the Vanguard fund was used to pay the cost of the trip to France. Since Wife's distribution has been reduced, the marital

estate should not be reduced a second time.

(Trial Court Opinion at 21). The reasoning of the trial court is sound. Therefore, the court's disposition regarding the funds related to these two incidents was not an abuse of discretion. *See Gilliland, supra.*

¶ 18 Husband's fourth argument takes issue with the trial court's resolution of the Vanguard account. Wife withdrew $300,000 from a jointly held Vanguard account and deposited the sum in an account with another bank. When Vanguard demanded a return of this withdrawal, Wife was not able to account for $19,000. Vanguard then reimbursed the other bank for the missing $19,000 out of the couple's account. Husband posits he is entitled to a $38,000 reduction in the marital estate, $19,000 for the money spent by Wife and $19,000 for the money reimbursed from the couple's joint Vanguard account. By deducting only $19,000 from the marital account, Husband alleges the trial court abused its discretion. We do not agree.

¶ 19 In response, the trial court stated:

Husband's argument that the Special Master should have counted the $19,000 funds twice would amount to double dipping and create a windfall for Husband. The marital estate was reduced by $19,000 when Wife withdrew funds and repaid all but $19,000 to the Vanguard account. The Special Master properly charged Wife for that $19,000. Husband is not entitled to a $19,000 credit at the same time that the funds are distributed to Wife in the equitable distribution. I find that the Special Master's recommendation was proper.

(Trial Court Opinion at 7). We agree with the trial court. There was only one amount of $19,000 spent, which was properly charged to wife. Thus, there was no abuse of discretion. *See Gilliland, supra.*

¶ 20 Husband also challenges the trial court's conclusion that he received rental income from two real estate properties he owns. He asserts the Master improperly relied upon Wife's experts, who testified as to the income generated from these properties. Therefore, Husband concludes the trial court abused its discretion by including these rental incomes in its calculation of the marital estate.[4] We disagree.

¶ 21 In addressing the first of these properties, the trial court explained:

> At the hearing before the Special Master, Wife's expert Dennis K. Bieler, CPA, testified that he reviewed the parties joint tax returns for the years 1992 and 1993 to determine the expected rental income from the property for the period from post-separation through 1997 when the property was sold. His estimate included the real estate taxes and interest expenses reported on the tax returns.
>
> Husband argues that Mr. Bieler's report incorrectly states the amount of the mortgage interest, repairs and taxes. The Special Master noted, however, that Husband failed to present the monthly mortgage amount. Moreover, at the Hearing Husband failed to object to the admission of Exhibit P–26 and failed to question Mr. Bieler regarding his report during cross-examination. I find that the record supports the Special Master's conclusion that Husband received $13,813 in marital funds from rental income attributable to the Indiantown Road property.

(Trial Court Opinion at 17) (citations to notes of testimony omitted).

¶ 22 Regarding the second property, the court reasoned:

> The Special Master relied on the report provided by Wife's experts to attribute rental income of $139,706 for the Byers Road property. This figure includes imputed income for the years 1998 and 1999. Wife's expert, Mr. Bieler, who prepared the report, testified that even if the rent was not paid, Husband's corporation owed Husband $24,000 in yearly rent based upon prior years. He also testified that if Husband had reported that rental income on his 1998 income tax return, that income would have been considered as part of his support obligation.
>
> The Special Master found that the fair rental value of the property remained at $24,000 per year, and imputed that income, calculated from the date of separation, to the marital estate. Husband asserts that the Special Master erred in relying on Exhibit P–27 to determine the amount to which the marital estate was enhanced by rental proceeds, because the businesses did not pay rent after 1997. He claims Wife is not entitled to a portion of the rental value because the building was necessary to operate the businesses that generated income that enabled Husband to pay Wife spousal support. The Special Master noted that "it is recognized that the rent was not paid, as testified by Husband, but the lack of payment does not nullify the obligation that it was due and owing." She recommended that the rental income of $139,706 be distributed to Husband. She did not recommend that Wife receive a portion of the rental

---

4. In his appellate brief Husband also raises an argument regarding a third piece of property located in West Chester, Pennsylvania. However, Husband failed to raise this issue in his exceptions to the Special Master's report and in his 1925(b) statement of matters complained of on appeal. Therefore, Husband has waived this issue. *See McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655 (Pa.Super.2000).

value of the property. I find that it was within the Special Master's discretion to recommend an imputed rental income on the property to the marital estate based on the testimony and evidence presented at the hearing.

(Trial Court Opinion at 18–19) (citations to notes of testimony omitted). We see no abuse of discretion when the court imputed rental income to Husband from the two pieces of property. *See Gilliland, supra.*

¶ 23 Husband next attacks the trial court's award to Wife of $30,000 in attorney's fees. He argues Wife failed to show actual need in accordance with *Budnick v. Budnick,* 419 Pa.Super. 172, 615 A.2d 80 (1992), *appeal denied,* 533 Pa. 641, 622 A.2d 1374 (1993). Additionally, he contends Wife failed to demonstrate the value of her counsel's service as required by *Perlberger v. Perlberger,* 426 Pa.Super. 245, 626 A.2d 1186 (1993), *appeal denied,* 536 Pa. 628, 637 A.2d 289 (1993). Despite Husband's request, Wife refused to produce detailed billing statements for her attorney's services. For these reasons, Husband believes the trial court's award of $30,000 in attorney's fees to Wife was an abuse of discretion.

¶ 24 Wife also takes issue with the trial court's grant of attorney's fees. She alleges her litigation expenses total more than $305,000, and she should be entitled to a larger award package to compensate for Husband's contemptuous and obdurate behavior during the divorce proceedings.

¶ 25 Our ability to review the grant of attorney's fees is limited, and we will reverse only upon a showing of plain error. *Gilmore v. Dondero,* 399 Pa.Super. 599, 582 A.2d 1106, 1109 (1990). Plain error is found where the decision is based on factual findings with no support in the evidentiary or legal factors other than those that are relevant to such an award. *Id.* When reviewing the grant of attorney's

fees, this Court must take into consideration,

the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was "created" by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

*Id.* at 1109 (citing *LaRocca Estate,* 431 Pa. 542, 246 A.2d 337 (1968)).

¶ 26 Regarding this issue, the trial court explained:

Wife's appraiser, Mr. Beiler, testified that he had difficulty obtaining documents from Husband and from Husband's accountants. When he requested certain documents, Husband's office sent incomplete documents or no documents at all. During the course of two contempt hearings, the parties prepared an agreed upon list of documents and Husband was ordered to produce the documents by a specified date.

The Special Master found that Husband's behavior was obstructionistic and contemptuous. She determined that Husband's behavior in other areas regarding the divorce was similar to his behavior with respect to Mr. Beiler, particularly when Husband would not permit Wife's real estate appraiser access to any of the marital commercial real estate. The Special Master reasonably considered the fact that Wife's attorneys' and expert fees for the entire litigation total over $305,000. But she de-

termined that Wife's considerable assets enable her to pay her counsel fees, costs and expenses. The award to Wife of $30,000 in counsel fees was an appropriate award in light of Husband's behavior during the proceedings and Wife's proceeds from her personal injury award.

\* \* \*

In *Perlberger*, the trial court denied the Wife's request for counsel fees. The Superior Court determined that the factors to be considered in awarding counsel fees in a divorce action include the payor's ability to pay, the requesting party's financial resources, the value of the services rendered and the property received in equitable distribution. *Id.* at 1207. The Court found that the trial court's denial of counsel fees was not an abuse of discretion because the trial court performed a comprehensive review of the attorney's billing sheets and found that:

"[T]he fees are grossly excessive when you compare them against the amount of work performed, the character of the services rendered, the difficulty of the problems involved, the importance of the litigation, the amount of money or value of property in question, and the ability of the client to pay a reasonable fee for services rendered."

*Perlberger, supra.*

Husband fails to note that the Special Master awarded counsel fees as a result of Husband's conduct during the protracted divorce proceedings. The Master noted that the Honorable Jacqueline M. Carroll of the Chester County Court of Common Pleas assessed counsel fees against Husband in response to Wife's Petition for Contempt. Husband's conduct continued to be obstructionistic and contemptuous thereafter, and the Special Master found that Wife's fees were excessive due to Husband's conduct.

I find that it was within the Special Master's discretion to award counsel fees pursuant to 42 Pa.C.S.A § 2503(7) which provides in pertinent part:

Persons entitled to reasonable counsel fees include any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatoius [sic] conduct during the pendency of a matter).

(Trial Court Opinion at 33–36) (citations to notes of testimony omitted). Here, the record contains more than enough evidence to support the court's award of counsel fees. *See Gilmore, supra.* Thus, we will not overturn the grant of $30,000 in attorneys' fees to Wife.

¶ 27 Husband's seventh argument focuses on a large loan he made to one of his businesses in 1993, the year of the separation. This loan was distributed from marital funds. Husband's expert testified this type of loan is considered a "wash" when evaluating the business, as the increase in assets is countervailed by the increase in liability. The trial court determined the notes payable on this loan were marital property subject to equitable distribution. Husband concludes this determination was an abuse of discretion. We do not agree.

¶ 28 The court approached this issue by observing:

The Special Master found that just prior to separation, Husband lent the company $237,500 of marital money for the purchase of land to develop. "The $237,500 was lent to the corporation during the marriage and therefore, the debt of the businesses resulting from the loan is an asset of the marriage and shall be considered as much." She noted that Wife never received any of the funds from repayment of the notes.

Husband's valuation expert, Mr. Egler, testified that when someone invests funds in his own business, the value of the cash in the business goes up, but it is offset by the liability. He described the corresponding increases in the asset and in the liability as "a wash" when evaluating the business.

I find that the record supports the Special Master's recommendation that the debt of the businesses is an asset of the marriage. Including the notes payable as marital assets did not improperly inflate the value of the marital estate. As Mr. Egler testified, whether or not the loan is repaid, if the loan is taken from the marital estate at some point, it has to show up either as an asset on the personal books as money being owed back to Husband or it is repaid. Husband's argument is not supported by the opinion of his own expert, Mr. Egler.

(Trial Court Opinion at 22) (references to notes of testimony omitted). We agree with the reasoning of the trial court, and adopt it as our own. The court did not abuse its discretion in characterizing Husband's business loans as marital property subject to equitable distribution. *See Gilliland, supra.*

¶ 29 Next, Husband challenges the 50–50 equitable distribution scheme of the marital property. Reiterating his previous arguments, Husband contends he should have been awarded a greater share of the marital estate. In support thereof Husband cites, *inter alia,* his responsibility for the upkeep of the marital estate, his duties to provide for the physical and financial well-being of his two children, and his support of Wife since the time of separation. Thus, Husband concludes the trial court abused its discretion in fashioning a 50–50 distribution scheme. We cannot agree.

¶ 30 Before recommending a 50–50 distribution, the trial court performed a meticulous and comprehensive review of the eleven Section 3502 factors as they applied to Husband and Wife. The court reasoned as follows:

As to the first two factors of Section 3502, the length of the marriage was 12 years and eleven months. It was the first marriage for both. These factors do not favor either party for the purposes of equitable distribution.

The third factor is the "age, health, amount and sources of income, vocational skills and employability, estate, liabilities and needs of the parties." Wife is 49. Husband is 47. Wife testified that she takes medication for chronic depression and she is under a lot of stress. She experienced a thumb injury which interfered with her ability to work as an esthetician. Husband did not testify to any health problems.

Wife has a high school diploma and has taken several college courses. She has worked full time as a realtor for 7 years until the parties first child was born. She is a licensed esthetician and has worked in catering, retail and landscaping. Wife is not working at present. Husband has a high school diploma and spent one year in college. Husband has worked in construction since high school. As stated above he builds custom homes and owns two corporations.

The Special Master relied on Judge Endy's Support Order which found that Wife has monthly needs of $4,700 and Husband has monthly needs of $4,700. The Special Master also noted that both parties have incurred legal and expert fees for the prosecution and defense of this divorce. She determined that this category is weighed in favor of Wife for purposes of equitable distribution. I find the Special Master's calculations to

be reasonable in light of the evidence presented. The evidence supports the Master's conclusion that the third factor weighs in favor of Wife.

The fourth factor is "the contribution of one party to the education, training or increased earning power of the other party." Wife became a certified esthetician during the marriage. Although there was no evidence presented concerning how Wife paid for this education, the Special Master found that Wife's education was paid for with marital funds because Wife had no separate assets of her own. I find that the Special Master's recommendation that this category weighed slightly in favor of Husband was reasonable.

The fifth factor is the opportunity of each party for future acquisitions of capital assets and income. The Special Master found that Husband's opportunities for the acquisition of capital assets are far superior to those of Wife. It is certainly true that Wife has diverse skills of her own. Even if she recovers from her thumb injury and resumes working full time, however, her earnings will not reach the level that Husband can earn by building upscale, custom homes. The Special Master concluded that the fifth factor weighs slightly in favor of Wife, and her finding is supported by the evidence.

The sixth factor is the "sources of income of both parties, including, but not limited to, medical, retirement, insurance, or other benefits." The Special Master did not include Wife's malpractice settlement in the 50–50% distribution, but rather [the Master recommended] that Husband receive 10% of the settlement proceeds, and decreased Wife's distribution and increased Husband's distribution accordingly. In his Exception Husband also asserts that he is entitled to a greater portion of

the distribution of the marital estate because Wife received a substantial personal injury award. As we have determined that the personal injury settlement is not a marital asset subject to division, this argument will be more appropriately discussed below in connection with property set apart to each party.

With the exception of the proceeds from Wife's lawsuit, the sixth category weighs slightly in Wife's favor. The Special Master found that Wife has made a few contributions to her IRA, but Husband has not contributed to either of his retirement accounts since the date of separation. Although Wife has an interest in five different trusts, she may not receive income from the trusts for some time. Husband provides health insurance for the family. The Special Master addressed these issues in her discussion of the fifth category. I find that the evidence supports the finding of the Special Master that this category weighs slightly in favor of wife.

The seventh factor is the "contribution of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party homemaker." The Special Master found that there was no evidence offered of assets brought by the marriage by either party at the time of their marriage or afterwards. Wife worked at the beginning of the marriage but stayed home once the children were born. She performed the housekeeping responsibilities until the parties separated. Husband worked and supported the family.

Husband contends that he is entitled to a greater share of the marital estate. He claims that since Wife's departure in 1993:

1. He has assumed the sole responsibility for preserving the marital estate;

2. He was left with the responsibility of the upkeep and maintenance of the marital residence and the rental property;

3. He was left with the financial burden of the mortgages, tax payments and repair bills associated with both properties;

4. He was responsible for placing both properties on the market and getting them ready for sale;

5. He has been solely responsible for the physical, emotional and financial well-being of the parties minor children since 1993; and

6. He has served as Wife's sole means of support since 1993.

Husband's arguments concern his post-separation contributions to the marital estate. The Special Master found that during the marriage both parties made appropriate contributions of money, time and labor to the marriage. I find that the evidence supports the Special Master's recommendation that this category is neutral.

The eighth factor is the value of property set aside to each party. The Special Master found that neither party has substantial assets that are not part of the marital estate, other than Wife's small post-marital IRA contributions and Husband's inherited stocks. Therefore, the Special Master found this factor weighs slightly in favor of Wife. As we have determined that Wife's personal injury settlement is her separate property, this factor [now] necessarily weighs in Husband's favor.

The ninth factor is the standard of living of the parties during the marriage. The parties maintained a lavish standard of living during the marriage which includ-ed: private school for the children; new cars every three years; a 30 acre farm; other buildings and full time help. This factor does not weigh in favor of either party.

The tenth factor is the "economic circumstances of each party, including Federal, State and local tax ramifications at the time the division of the property is to become effective." The record contains no evidence regarding tax benefits or other relevant considerations pursuant to this factor. Thus, this category is neutral.

The eleventh factor is whether the party will serve as a custodian of minor children. Husband cared exclusively for the two children after Wife left the marital home. The eldest of the two children is now 18. Husband contends that he is entitled to a greater portion of the marital estate because he has had full legal and physical custody of the children since 1993.

The Special Master acknowledged that the children live with Husband, but found that "it is what occurred during the marriage that carries the most weight with the Court in the analysis of the divorce factors." She found that this category weighs heavy in Husband's favor. I find the Special Master gave proper consideration to the fact that Husband has been the custodian of the children. The evidence supports the Special Master's finding that this category weighs [in] favor of Husband.

After a consideration of the factors, I find that five factors are evenly weighed between the parties, two favor Husband and one weighs in Wife's favor, one favors Husband slightly and one favors Wife slightly. While Husband has accumulated one more "factor" than Wife, that does not compel any particular resulting distribution. If the recom-

mended distribution complies with the Divorce Code's mandate to "effectuate economic justice," 23 Pa.C.S.A. § 3102(a)(6) we will not disturb it. Here, although Wife has a separate estate in the form of her settlement, Husband's consistent high earnings and ability to acquire future capital assets are powerful resources. Our review of the factors does not lead us to conclude that either party is sufficiently disadvantaged that economic justice requires a disparate distribution of marital assets. Thus, I find that distribution of 50% of the marital property to Husband and 50% to Wife as recommended by the Special Master is reasonable, and I adopt her recommendation.

(Trial Court Opinion at 24–29) (citations to notes of testimony omitted). The trial court's reasoning is justified by the record and its conclusions will not be disturbed on appeal. *See McNaughton, supra; Gilliland, supra.*

 ¶ 31 In his ninth argument, Husband takes issue with the value assigned to Wife's earning potential. Husband argues the miscalculation of Wife's earning capacity improperly absolved her of any duty to contribute financially to the support of her children. Husband asserts Wife's educational background and employment history are indicative of her capacity to earn more than the $2000/month attributed to her by the trial court. Husband contends the trial court should not have relied on Wife's last period of employment as a catering manager as an indicator of her earning potential. For these reasons, Husband again alleges an abuse of discretion. We disagree.

¶ 32 The trial court explained:

At the time of the hearing, [Wife] was employed for Queen of Hearts, Inc. as a corporate catering manager, working between 30 and 35 hours per week and earning $12.00 per hour plus tips. However, she testified that her employer recently informed her that she will be soon laid off. Nevertheless, we find her current income representative of her earning capacity given her education and experience. Although [Wife] is undergoing court-ordered psychotherapy and taking medication for depression, she conceded there is no medical restriction limiting her ability to work. Given her education and experience, [Wife] should be able to find comparable employment in the event she is laid off from her present position. Consequently, we will hold her to an earning capacity of $2000.00 per month, her net monthly income as of the date of the hearing.

(Trial Court Opinion, dated July 3, 1997, at 2). Due to Wife's allegedly incapacitating thumb injury, the trial court has twice reviewed her earning capacity. (*See* Trial Court Opinion, dated December 8, 1999, at 3; Trial Court Opinion, dated February 2, 2000, at 7.) On both occasions, the trial court concluded that Wife's earning capacity had not diminished. (*Id.*) Because there are valid grounds for the assessment of Wife's earning capacity at $2000, we have no basis to interfere with the trial court's determination. *See McKolanis, supra.*

¶ 33 Husband's tenth argument centers on the trial court's spousal and child support calculations. Husband avers Wife was improperly absolved from her duty to pay child support. We prefer to address this issue along with Wife's first argument on cross-appeal.

 ¶ 34 Finally, Husband challenges the trial court's requirement that he provide health insurance and unreimbursed medical expenses for Wife and their children. Husband maintains Wife has sufficient financial resources to provide for her

reasonable monthly living expenses, and reiterates his contention that Wife should contribute to her children's support. In this manner, he concludes the trial court abused its discretion. We disagree.

¶ 35 Under the guidelines, "a party's payment of a premium to provide health insurance coverage on behalf of the other party or the children shall be allocated between the parties in proportion to their net incomes." Pa.R.C.P.1910.16–6(b)(1). However, both the question of whether to require the obligor spouse to pay the other spouse's health care expenses, as well as the question of the proper percentage to assess, is within the discretion of the trial court. *Kessler v. Helmick,* 449 Pa.Super. 113, 672 A.2d 1380 (1996); 23 Pa.C.S.A. § 4324.

¶ 36 Instantly, the trial court determined Husband's net monthly income was $18,534, while Wife's was $3,959. (Trial Court Opinion, dated February 2, 2000, at 7). Due to the disparity in this income, the court did not abuse its discretion in requiring Husband to provide health insurance for Wife and the children and to pay 100% of their unreimbursed medical expenses. *See Kessler, supra.*

¶ 37 We now turn to Wife's issues raised in her cross-appeal. In her first issue, Wife challenges the spousal and child support calculations made by the trial court. Wife explains the trial court did not properly follow the guidelines, specifically Section 1910.16–4(e), when computing the parties' support obligations. Wife argues the guidelines require spousal support to be computed initially as if the couple were childless. Then, for purposes of assessing child support, the actual incomes of the parties should be adjusted to reflect the spousal support either paid or received. Instead, Wife contends, the trial court calculated child support obligations before computing the parties' spousal support re-

quirements. Due to this mistake, the trial court's grant of spousal support to Wife was significantly understated. Wife seeks a remand to re-calculate her support payments in accordance with guidelines. We agree.

¶ 38 Where the parties have a combined net monthly income in excess of $15,000 per month, the child support guidelines outlined at Pa.R.C.P.1910.16–3 no longer apply. *Mascaro v. Mascaro,* 569 Pa. 255, 803 A.2d 1186 (2002). Instead, in each such case the trial court must independently determine the reasonable expenses involved in raising the particular children according to the analysis explained in *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984). *Mascaro, supra* at 265–66, 803 A.2d at 1193. However, the *Melzer* analysis does not apply to spousal support calculations. *Id.* Where the combined income of both spouses is more than $15,000 per month, the court is still constrained to follow the spousal support calculations detailed at Pa.R.C.P 1910.16–4. *Id.* Thus, when the combined monthly income of the parties totals more than $15,000, Pa.R.C.P 1910.16–4 governs spousal support, while *Melzer* controls child support. *Id.* at 265–66, 803 A.2d at 1193.

¶ 39 Where the custodial parent of the children is obligated to pay spousal support, the parties' spousal support must first be determined under Pa.R.C.P. 1910.16–4(20–25) as if they were childless. Pa.R.C.P.1910.16–4(e). Next, the net income of both parties must be offset by the amount of spousal support they pay or receive. *Id.* It is only with these adjusted net incomes that a calculation of the non-custodial parent's child support obligation is computed. *Id.* Finally, the child support obligation of the non-custodial parent is to be subtracted from the spousal support

owed by the custodial parent to the non-custodial parent. *Id.*

¶ 40 Here, the trial court assessed Husband's net monthly income at $18,534 and Wife's monthly income at $3,959. The spousal support for parties with no dependent children is 40% of the difference in incomes ($14,575), or $5830 to Wife per month. *See id.* After adjusting the incomes to compensate for Husband's spousal support payments, Husband and Wife are left with monthly incomes of $12,704 and $9789, respectively. *See id.*

■ ¶ 41 Applying a *Melzer* analysis, in 1997 the trial court determined the financial needs of the children to be $3500 per month. (*See* Trial Court Opinion, dated July 3, 1997, at 5–6.) Subsequent to this ruling, however, the presumptive minimum identified in the guidelines was raised. In its February 3, 2000 opinion, the trial court determined that the needs of the children had not changed during the intervening three years. Nevertheless, the court proceeded to "inflate" the children's financial needs to $3653 to comport with the increased presumptive minimum. (*See id.* at 7.)

¶ 42 The correct figure representing the needs of the children, as determined by the trial court's *Melzer* analysis, is $3500. Because the court determined the needs of the children had not changed since its original *Melzer* analysis, it had no authority to inflate the figure to account for the increase in the presumptive minimum. This $3500 figure is still well above the current presumptive minimum of $2945. *See* Pa.R.C.P.1910.16–3.

■ ¶ 43 The trial court determined both parents could meet their reasonable needs with an expenditure of $4700 per month. Subtracting this value from the parties' adjusted net monthly incomes leaves Husband with $8004 and Wife with $5089 of available monthly income. Using those figures, Wife's obligation is 5089/(5089 + 8004) × 3500 = $1360.38. *See Melzer, supra.* Husband's obligation is 8004/(5089 + 8004) × 3500 = $2139.61. *See id.* Subtracting Wife's child support obligation from Husband's spousal support obligations leaves her with $4469.62 in net spousal support payments each month. *See* Pa.R.C.P.1910.16–4(e). Because the trial court did not accurately follow the formulas for calculating child and spousal support, specifically Pa.R.C.P.1910.16–4(e) and the *Melzer* analysis, it committed an error of law. *See Portugal, supra.* Thus, we remand this case to the trial court to recalculate support.[5]

■ ¶ 44 Next, Wife challenges the trial court's calculation of her income available for support. The parties agree they both received $35,000 as an advance against equitable distribution. Wife cites *Miller v. Miller,* 783 A.2d 832 (Pa.Super.2001), for the proposition that proceeds from equitable distribution may not be counted as income available for support. As a result, the settlement proceeds were improperly inflated, and the amount of imputed interest from this figure was overvalued. By Wife's calculation, the amount of this over-valuation was $1,750 per year.

¶ 45 The evidence of record supports Wife's contention that the $35,000 was a court-ordered advance against equitable distribution taken from the marital estate. *See* R.R. at 274a, 765a; Brief of Appellant at 32, 47–48. Husband admits that pursuant to the same order he took a matching $35,000 from the marital estate *See id.*

---

5. Of course, the calculations made by this Court are for illustrative purposes only and will be subject to change, because of our adjustment of Wife's gross annual unearned interest income and the resolution of the remaining issues on remand.

Nevertheless, the trial court characterized Wife's $35,000 advance as part of Wife's proceeds from her tort action, and from this sum imputed interest earnings of $1,750 to Wife's income available for support. *Diament v. Diament*, 44 Pa.D. & C.4th 135, 138–39 (Chester Co. Court of Common Pleas, 2000). Therefore, the trial erred when it imputed $1,750 to Wife's income available for support. *See Miller, supra; Diehl on Behalf of Beaver, supra.* Consequently, Wife's gross annual unearned interest income should be reduced accordingly.

¶ 46 In a related issue, Wife argues the trial court should not have adopted the figure of $5,247 as the portion of her 1998 interest and dividend income that was not traceable to her malpractice settlement. When calculating Wife's interest income for 1998 the trial court did not realize she had deposited the bulk of her settlement proceeds into an account with Dean Witter. Consequently, when calculating Wife's earned interest for 1998 the court mistakenly twice counted the interest earned from her settlement, by adding to the imputed interest from the settlement the interest earned from the Dean Witter account where she had deposited the settlement. To redress this error, the trial court subtracted from its calculation of Wife's total 1998 interest and dividend payments the interest paid from Dean Witter accounts during that year. Wife maintains the trial court should have also subtracted from her total interest payments a dividend payment listed on her 1998 tax return as "Active Assets Money Trust." She avers this interest payment was also from a Dean Witter account. In failing to correct its "double-dipping" regarding this interest payment, Wife alleges her income available for support was overstated by $4,843 per year. Wife asks for a remand to recalculate her income available for support to account for this alleged error. We agree.

¶ 47 There is evidence on the record the "Active Assets Money Trust" was a Dean Witter account. *See* R.R. at 771a. However, there is no evidence, save for Wife's assertions, that the money contained in this account is proceeds from her personal injury settlement. Wife's testimony that she deposited some of her settlement proceeds into a Dean Witter account is not conclusive of whether this particular Dean Witter account contained settlement proceeds. Therefore, we remand the case to the trial court for a determination of whether Wife's Active Assets Money Trust is a Dean Witter account containing proceeds from Wife's personal injury settlement. If so, Wife's net yearly income was overstated.

¶ 48 Next, Wife argues the trial court understated Husband's income available for support. Wife asserts the trial court failed to include in Husband's income a $140,000 corporate distribution listed on Husband's corporate 1998 tax return. Wife also claims the court improperly excluded a $100,819 loan repayment made to Husband by his company. Wife also avers the trial court did not consider $85,727 of perquisites Husband enjoyed at his business' expense. Finally, Wife submits the trial court erred in refusing to adopt her expert's opinion on the value of construction contracts completed by Husband's corporation during 1998. Wife concludes the trial court abused its discretion in ignoring her expert's competent testimony and substantially understating Husband's income for 1998. We agree, in part.

¶ 49 In determining Husband's earnings for 1998, the court reasoned:

[Husband's] 1998 W–2 shows earnings of $60,840. In addition, according to Diament Building Corp.'s 1998 tax return and schedule K–1, [Husband] received a

distribution in the amount of $90,160, interest income in the amount of $10,539, and a shareholder loan of $138,890. Lastly, we imputed to [Husband] dividend income in the amount of $27,500, as reflected in his 1997 individual tax return, his last personal tax return of record. From these sources, [Husband's] gross annual income for 1998 is $327,929.

Next we estimated [Husband's] 1998 tax liability. For 1998 we estimated his federal tax to be $98,651, based on state tax of $1,680, local wage tax of $600, social security tax of $3,720 and medicare tax of $870. Net of such taxes, [Husband's] net monthly income would be $18,534. [Husband] is also entitled to a deduction in the amount of $43,200 annually, or $3,600 per month, representing the amount of support he pays to his wife. [Husband] is left with a net annual income of $179,208, or $14,934 per month.

(Trial Court Opinion, dated December 8, 1999, at 2). Our independent review of Diament Building Corporation's 1998 tax return, schedule K, line one, reveals Husband's company distributed $90,164 as ordinary income to Husband. However, on line twenty of the same schedule, the corporation reports $142,000 as the amount of total property distribution (including cash) to Husband. The record is not clear why Judge Endy decided to adopt $90,160 as the total amount of corporate distributions Husband received from his company in 1998. Moreover, we are unable to discern whether the correct amount Husband received in corporate distributions is the difference between the $142,000 and 90,164 figures, or their sum. Resolution of this issue is best left to the trial court and the parties' experts. Thus, we remand to the trial court for a determination of the amount of corporate distributions received by Husband in 1998.

¶ 50 In regard to the $100,819 Husband received in 1998 as payback from a loan to his corporation, Wife does not clarify the total amount of the loan, the nature of the loan, or the date on which the loan was made. To the extent this payback may have originated from the $237,000 business loan Husband made to his company from the parties' marital estate, Wife has already been compensated for her share of the loan proceeds through equitable distribution. Thus, this issue warrants no relief. *See Miller, supra.*

¶ 51 We do agree with Wife that Husband may have undervalued his income by inflating corporate operating costs to absorb certain personal expenses. If so, these would constitute perquisites, which should be considered when calculating income available for support. It does not appear from the record that Judge Endy took Husband's perquisites, if any, into consideration when calculating Husband's net income for support purposes. *See Hoag v. Hoag,* 435 Pa.Super. 428, 646 A.2d 578 (1994), *affirmed,* 541 Pa. 621, 664 A.2d 1354 (1995) (holding court should pierce corporate veil to determine if spouse's ability to pay support is enhanced by advantages that spouse enjoys as member of his own corporation). Therefore, our remand for recalculation of Husband's income available for support should also include a specific finding by the trial court of the perquisites, if any, Husband receives from his corporation. If the court determines that any perquisites exist, the court should make the appropriate adjustments to Husband's income.

¶ 52 Finally, regarding the value of construction contracts completed by Husband's corporation in 1998, the trial court stood in the best position to make factual findings and credibility determinations regarding this issue, and we will not interfere with its broad discretion when

making this calculation. *See McKolanis, supra.* Consequently, this issue has no merit.

¶ 53 In her last argument, Wife contends the trial court should have adjusted Husband's income to include or account for the tax savings he enjoys as a result of his spousal support payments. As authority for this proposition, Wife cites *Reisinger v. Reisinger*, 324 Pa.Super. 223, 471 A.2d 544 (1984). Wife reasons the Internal Revenue Code deductions apply equally to support payments and alimony, and so the same principle applies in the instant matter. Wife suggests the court erred when it failed to consider Husband's tax savings in computing his income available for support. Wife seeks a remand to recalculate Husband's income available for support in light of the tax savings afforded to him by his spousal support payments. We agree.

¶ 54 In *Reisinger*, this Court explained:

The second issue presented by [wife] is whether an unallocated award [6] should be based on the former husband's gross, rather than net, income. She argues that it should be based on the gross income because basing it on his net income results in a windfall to him.

In order to deal with this argument, the terms involved must be defined. The husband's gross income is just that-his total income prior to the payment of any taxes. His "net income," **as that terms was used below**, means the income left after the husband pays the taxes that he would owe as a single taxpayer not paying alimony.

However, ... [h]e would not have to pay income tax on the amount paid as alimony. This would result in his paying less

income tax than the "net income" method indicates he would be paying.

Wife's argument here is that the trial court erred in computing the alimony award based on [the husband's] "net income." She accurately points out that this method results in a lower post-tax figure than the one which will actually occur under the operation of the award. Up to this point, wife is quite persuasive. She errs in the option she suggests be used in setting the amount of the award. Rather than his "net income," she proposes that his gross income be the determinative amount.

[The husband] responds that basing the support award on his gross income could be confiscatory. This is also an accurate statement. If the amount of the award were based on [the husband's] gross income and then computed using tables designed to be used for "net income" figures, the resulting award could indeed be excessive and confiscatory....

We are thus left with neither alternative proposed by the parties below being proper. The "net income" figure advocated by [the husband] is factually inaccurate and the gross income figure advocated by [wife] could also work an injustice. The adversary process has brought this issue to our attention. But, due to the self-serving positions propounded by each party, it is consequentially our responsibility to determine what the correct process should be.

Following from our exposition above, we hold that the amount of an alimony award should be established taking into consideration the actual post tax net income of the payor under the award.

---

6. Our case does not involve an unallocated support award as in *Reisinger*. The present case involves only a spousal support order. Moreover, here the spousal support award is initially calculated as if the couple is childless because the parent owing spousal support is also the custodial parent.

This actual post tax net income would be determined by taking into consideration the decreased tax liability due to the tax deductible alimony.

In coming to this conclusion, we are simply applying well-established law: "...it is clear that a spouse's present expendable income, potential earning power, and property and financial resources rather than his net income, determine the reasonableness of a support order." *Commonwealth ex rel. ReDavid v. ReDavid*, [251 Pa.Super. 103, 380 A.2d 398 at 400 (Pa.Super.1977)]. Since [husband's] tax liability would decrease as a result of his alimony payments, his "expendable income" would accordingly rise. Fashioning support awards without taking into account their tax consequences amounts to making calculations based on false data.

*Id.* at 546–47 (emphasis in original). Alimony and separate maintenance payments are equally deductible from the payer's income. 26 U.S.C.A. § 215(a). The definition of a "separate maintenance payment" includes a spousal support payment made pursuant to a divorce or separation instrument. 26 U.S.C.A. § 71(a).

█ ¶ 55 In the present case, we agree with Wife that Husband's decreased tax liability due to the deductibility of his spousal support/alimony payments should also be taken into consideration when formulating the court's spousal support award to Wife. *See Reisinger, supra.* Judge Endy's first calculation of Husband's net monthly income was "based on his annual gross income of $300,000 less $90,000 for estimated Federal (**including the adjustment to gross income for spousal support**), State and local income taxes and employment taxes." (Trial Court Opinion, dated July 3, 1997, at 5 (emphasis added)). Judge Endy clarified his method of calculation in a later opinion, as follows:

...[Husband's] gross annual income for 1998 is $327,929.

Next we estimated [Husband's] 1998 tax liability. For 1998 we estimated his federal tax to be $98,651, based on state tax of $1,680, local wage tax of $600, social security tax of $3,720 and medicare tax of $870. Net of such taxes, [Husband's] net monthly income would be $18,534. **[Husband] is also entitled to a deduction in the amount of $43,200 annually, or $3,600 per month, representing the amount of support he pays to his wife.** [Husband] is left with a net annual income of $179,208, or $14,934 per month.

(Trial Court Opinion, dated December 8, 1999, at 2) (emphasis added). However, in his February 3, 2000 opinion, Judge Endy decided, "[w]e agree with [Wife] that it was error to deduct the sum of $3600 per month from [Husband's] income, representing the spousal support he was required to pay pursuant to the July 3, 1997 order under scrutiny." *Diament, supra* at 138.

¶ 56 In *Reisinger*, this Court explained that simply subtracting the husband's spousal support payments from his gross income was factually inaccurate, and that calculating the husband's support payments from his gross income was excessive. *See id.* This Court concluded that the proper calculation of income available for support should take into consideration the actual post tax net income of the husband under the award. *See Reisinger, supra.* Here, the record indicates the trial court did not determine Husband's actual post tax net income by taking into consideration his decreased tax liability due to his tax deductible spousal support/alimony payments. *See id.* Therefore, we must remand to the trial court for a recalcula-

tion of Husband's spousal support payments to Wife consistent with *Reisinger*.[7]

¶ 57 We applaud the Herculean efforts of both Judge Endy and Judge Platt in resolving the bulk of the factually dense contentions raised by the parties in this case. However, we are constrained to remand this case to the trial court for a recalculation of the parties' support awards consistent with Pa.R.C.P.1910.16–49(e), *Melzer*, and *Reisinger*, and that takes into consideration Husband's correct corporate distribution(s) and business perquisites, and for a determination of whether Wife's "Active Assets Money Trust" is a Dean Witter account containing proceeds from her personal injury settlement. We recognize that the parties' continuously changing financial and custodial circumstances will invite them to seek continued modifications of their support obligations. However, the wisdom in attempting to settle this suit without further litigation is eminently apparent to this Court. Although we hope this realization is equally apparent to Husband and Wife, it seems unlikely. The parties' objective seems to be making this divorce litigation a lifelong career.

¶ 58 Based on the foregoing analysis, we hold, *inter alia*, that the trial court properly classified Wife's personal injury settlement as non-marital property. We also hold that the court erred in its calculations of the parties' spousal and child support obligations. Thus, after careful review of all the issues raised by the parties, we affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

¶ 59 Decree and orders affirmed in part and reversed in part; case remanded for further proceedings. Jurisdiction is relinquished.

---

**7.** This Court in *Reisinger*, however, does not explain if the previous year's tax savings *should be* used to calculate the spousal support due in the present year, or how *this* calculation should be computed if this is the first year the payor will be receiving deductions for support payments. Nevertheless, the parties' qualified expert accountants stand in the best position to make these sorts of determinations.