Renee N. ARBET, Appellee,

v.

Scott E. ARBET, Appellant.

Superior Court of Pennsylvania.

Submitted Sept. 27, 2004.
Filed Nov. 15, 2004.

*Commonwealth v. Singletary,* 803 A.2d 769 (Pa.Super.2002).

Andrew M. Fisher, West Chester, for appellant.

Carol E. Haltrecht, West Chester, for appellee.

BEFORE: BENDER, McCAFFERY and POPOVICH, JJ.

OPINION BY BENDER, J.:

¶ 1 Scott E. Arbet (Father) appeals from the April 16, 2004 amended order that required Father to pay child support for his and Renee N. Arbet's (Mother) three

children.[1]  Father contends that the value of his employee benefits package and the interest from a non-marital annuity should not be considered income available for child support.  He also argues that his support obligation was excessive in light of the parties' actual incomes, expenses and living arrangements, and that the court should have considered Mother's earning capacity rather than her actual income. We affirm.

¶ 2 Based upon testimony and evidence presented at a hearing held on January 22, 2004, the trial court set forth an extensive factual and procedural history of this case, which we reproduce here:

Father and Mother married in 1991. In December of 1992, their oldest child, Scott, was born.  The next year while the parties lived in Iowa, Mother worked part time as a research associate and, having completed her education, was awarded a Ph.D. in pharmacology.  Her work at that time was scheduled in accordance with childcare needs for Scott, and later Gregory, who was born in 1994.  When the parties moved to Pennsylvania in 1995, Mother initially did not work outside the home.  In 1996, the parties third child, Eric, was born.  In the late 1990s, Mother worked full time for a local market research firm earning approximately Seventy Thousand Dollars ($70,000.0) per year while working approximately seventy (70) hours per week.  During this period, Mother attempted to fit her professional schedule around the children's childcare and other needs.  In the spring of 1999, at the request of Father, Mother terminated that employment.  In 2002, Mother worked briefly at Drug Emporium.

When Father permanently left the marital residence in approximately the beginning of 2003, Mother secured employment as a pharmacist with Lankenau Hospital, working a full week from approximately 8:30 p.m. to 7:30 a.m. every other week.  Mother began this employment on February 2, 2003 and took it because it was the best job she could quickly find at a time when Mother's financial resources were strained due to Father's recent departure.  Although Father had suggested a few companies where she might gain employment, Mother did not apply to them because she believed her qualifications did not merit acceptance.  Her pharmacy degree exceeded the minimum qualifications necessary for the Lankenau position which aided her efforts to gain prompt employment there.  Mother has [looked] and continues to look for another position.

Her current Lankenau nightshift hours earn her a higher rate of pay than she would earn as a dayshift employee. Additionally, because Father and Mother share custody of the children on a week on/week off basis, her current work schedule allows her to work during those weeks she does not have custody of the children and eliminates the need for her to pay childcare costs.  Mother is currently forty-four (44) years of age and works approximately thirty-six (36) hours per week (approximately seventy-two (72) hours during the full week she works the night shift).  She currently receives benefits as part of her employment package at Lankenau.  In 2003 Mother earned, and in 2004 continued to earn, an annual gross salary of approximately Eighty–Two Thousand Two Hun-

---

1.  The parties are the parents of three sons, Scott Emil Arbet, born December 31, 1992, Gregory Austin Arbet, born November 23, 1994, and Eric Edward Arbet, born July 19, 1996.

dred Forty–Eight Dollars ($82,248.00) ($6,854.00/mo.).[4]

Mother continues to reside in the Malvern marital residence. The residence was recently appraised at approximately Six Hundred Fifty Thousand Dollars ($650,000.00). Expenses directly related to the marital residence are a first mortgage requiring a One Thousand Four Hundred Twenty–Two Dollar ($1,422.00) monthly payment, a second home equity mortgage requiring a One Thousand Four Hundred Ninety–Four Dollar ($1,494.00) monthly payment, real estate taxes of approximately Six Hundred Dollars ($600.00) per month and homeowner's insurance costing approximately Fifty–Eight Dollars ($58.00) per month (the total cost of the monthly mortgages, taxes and insurance is Three Thousand Five Hundred Seventy–Four Dollars ($3,574.00)). The home equity mortgage monies were acquired in 1999 to renovate the house.

Father earned a Ph.D. in education in 1994 and has been steadily employed since that date. In 2003, and currently, Father worked as an associate vice president for [the] National Board of Medical Examiners. Father's employer pays a part of the medical insurance benefit which covers the children and Father. Father contributes the balance of the medical insurance cost via a paycheck deduction in the amount of approximately Thirty–Seven Dollars and ninety-one cents ($37.91) per month. (Exhibit D–1; $17.50/pay × 26 two-week pay periods ÷ 12 months = $37.91/mo.).

Father's gross salary in 2003, totaled One Hundred Twelve Thousand Six Hundred and Eighty–Six Dollars ($112,-686.00) ($9,390.00/mo.). That year he also received a benefits package paid by his employer (including health insurance, life insurance, disability insurance, pension benefits, professional develop-ment benefits and employee services) totaling Thirty Five Thousand Eight Hundred and Nine Dollars ($35,809.00)[5] ($2,984.08/mo.) for total gross compensation in the amount of One Hundred Forty–Eight Thousand Four Hundred Ninety–Five dollars ($148,495.00) ($12,374.08/mo.) (Exhibit P–2).

In 2004, based upon a thirty-five (35) hour work week, Father's gross annual salary is projected to be One Hundred Twelve Thousand Three Hundred Ten Dollars ($112,310.00) ($9,359.16/mo.), with a benefits package (consisting of the same benefits previously described for the 2003 benefits package) totaling Forty–Six Thousand Forty–Seven Dollars ($46,047.00) ($3,837.25/mo.), for anticipated gross 2004 compensation in the total amount of One Hundred Fifty–Eight Thousand Three Hundred Fifty–Seven Dollars ($158,357.00) ($13,196.41[/mo.]) (Exhibit P–2).

In November of 1989, one of Father's grandfathers purchased from Hartford a Five Hundred Thousand Dollar ($500,-000.00) annuity for him. This annuity initially earned approximately eight percent (8%) interest for a term of up to ten (10) years. As the owner of the annuity, Father has had, and continues to have, the sole authority to decide how the annuity funds are invested and accessed. In 1998, he transferred the annuity fund to Protective Life Insurance Company with the assistance of his friend and investment planner, Brady Stamp.

Since the time of the annuity's original purchase and until August of 2002, the value of the annuity funds had fluctuated with [the] vagaries of the stock market. In August of 2002, Father switched the annuity investments from a variable account to a stable fixed account in an effort to remove funds from the performance of the stock market and pro-

tect the remaining fund corpus. As of December 31, 2002, the value of the annuity assets had grown to One Million One Hundred Forty–One Thousand Five Hundred Twenty–One Dollars and eighty-four cents ($1,141,521.84) (Exhibit P–4). All of the current annuity assets are in that fixed account which guarantees that Father's annuity investments will earn at least three percent (3%) per year, less approximately two percent (2%) in administrative fees. In 2003, the total interest earned on the annuity funds, less administrative costs, totaled Thirty One Thousand One Hundred Seven Dollars and sixty-six cents ($31,107.66) (Exhibit P–4).[6]

There are approximately thirty (30) to forty (40) options within the current annuity package from which Father can choose to invest and access the annuity assets. Father has the authority, which he has yet to exercise, of withdrawing as cash the three percent (3%) annual interest earned on the annuity funds. If Father withdraws the interest, he will be required to pay a ten percent (10%) penalty tax (i.e. $31,706.66 × .10 = $3,170.66; $31,706.66—$3,170.66 = $28,536.60 equals interest following deduction of penalty or $2,378.00/mo.) as well as income tax on that interest.

---

4 Although Mother's 2003 salary was based on this amount, her actual income was less because she began her employment on February 2, 2003.

---

5 Although the inclusion of Father's benefit packages as a portion of his income was not listed by him as an issue to be adjudicated, Father's support calculations submittal following the January 22, 2004 hearing averred that such a package could not be

**2.** Although the court included calculations for the period prior to January 1, 2004, we only have reproduced those calculations for the period beginning January 1, 2004 forward.

included as income. Contrary to Father's assertion, employer paid perquisites, such as those described in Father's 2003 and 2004 benefits packages, must be included as income. *Mascaro v. Mascaro*, 569 Pa. 255, 803 A.2d 1186, 1194 (2002).

---

6 Mother and Father stipulated that the parties' prenuptial agreement defined the corpus of the annuity assets prior to 2003 as among Father's assets and agreed that the only issue before the Court was whether the three percent (3%) annuity interest should be listed as income to the Father for purposes of calculating support.

Trial Court Opinion (T.C.O.), 4/16/04, at 2–6 (footnotes in original).

¶ 3 In addition to the above, the court provided its support calculations in chart form, which we also reproduce here:[2]

### January 1, 2004 Forward

#### Renee Arbet

| | |
|---|---|
| Gross monthly income: | $ 6,854.00 |
| Net monthly income following deduction of all taxes: | $ 4,729.36 |
| Basic child support per Rule 1910.16–3 support schedule: | $ 3,480.00 |
| Percent net income: | 31.61% |
| Monthly share of support: | $ 1,100.03 |

#### Scott Arbet

| | |
|---|---|
| Gross monthly income: | $15,574.41 |
| (salary ($9,359.16), benefits ($3,837.25), plus annuity interest following deduction of penalty ($2,378.00)) | |
| Net monthly income following deduction of taxes: | $10,231.56 |
| Combined net income: | $14,960.92 |
| Basic child support per Rule 1910.16–3 support schedule: | $ 3,480.00 |
| Percent net income: | 68.39% |
| Gross monthly share of support: | $ 2,379.97 |
| Adjustment for shared custody: per Rule 1910.16–4(c) | ($ 691.13) |
| Adjustment for health insurance: per Rule 1910.16–6(b) | ($ 11.98) |

---

| | |
|---|---|
| Net monthly share of support following deduction of above adjustments: | $ 1,676.86 |

Father's support obligation increased at that time by $69.27 per month or $15.94 per week.

Mortgage Adjustment: $ 491.92

**Father's Total Support for 2004
Following Mortgage Adjustment:**

$2,168.78/month
[o]r, $ 499.14/week

*Id.* at 10–11 (footnote omitted).

¶ 4 With regard to the mortgage adjustment of $491.92 added to Father's support obligation, the trial court noted that the parties agreed that mortgages, taxes and insurance on the marital residence equaled $3,574.00 per month, an amount that exceeded 25% of Mother's net income. In recognition of this amount and with reliance on Pa.R.C.P. 1910.16–6(e), the court explained that it could upwardly adjust Father's basic support obligation up to 50% of the excess amount. However, the court adjusted Father's support only up to 25% of the excess amount, explaining that the lower percentage was based on the fact that Father provided a home for the children on an equal basis with Mother. Also, in employing the lower percentage, the court stated that "the inclusion of the entire value of Father's benefit packages as part of Father's gross income, without deduction of the value of Father's employer's medical insurance contribution, create[d] an unusually large amount of attributed but unavailable income which has served to increase the basic support obligation." T.C.O. at 9. Accordingly, the court entered an amended order, dated April 16, 2004, setting Father's support obligation at $2,099.51 per month for the period prior to January 1, 2004 and $2,168.78 per month beginning January 1, 2004 forward.

¶ 5 Father now appeals to this Court, raising the following four issues for our review:

1. Whether the value of a benefits package associated with [Father's] employment is a perquisite and therefore "income" available for support.

2. Whether interest generated by an annuity held by Father is income [available] for support.

3. Whether the court's determination of [Father's] child support obligation is excessive considering the parties['] actual income, shared custody arrangement and current living conditions and expenses.

4. Whether the court erred in determining [Mother's] income when it failed to consider her income potential/earning capacity.

Father's brief at 9.

¶ 6 Initially, we note that in reviewing a support matter, we are guided by the following:

When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of that discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Laws v. Laws*, 758 A.2d 1226, 1228 (Pa.Super.2000) (citations omitted).

¶ 7 Father's first argument attacks the court's inclusion of the dollar amount of the perquisites he receives from his employer as part of his gross monthly income. Mother had offered into evidence two documents that Father receives from

his employer each year, entitled "Total Compensation Notification." The one document, dated December 12, 2003, states that "[t]his is your individual 2004 Total Compensation notification. Total Compensation consists of both your salary and the value of your benefits provided by the [Employer]." Exhibit P–2; Reproduced Record at 60a. In addition to Father's salary for 2004, the document lists his benefits package value at $46,047 followed by an asterisk, directing the reader to the following language: "This is an approximation and encompasses the average cost for health, life, disability, etc., pension benefits, professional development, and employee services benefits at approximately 41% of your base salary." *Id.* This is the document relied on by the trial court for the inclusion of $3,837.25 as the value of Father's monthly benefits for 2004.

¶ 8 Specifically, Father contends that costs, such as life insurance and disability insurance, which are deductible when paid individually by self-employed persons, should be deducted from his gross income because he is not self-employed. Additionally, Father argues that because no testimony was presented as to specific amounts his employer contributed to pension benefits or whether he was required to make contributions, that part of the perquisites should also not be included as income available for child support. We disagree.

■ ¶ 9 "When determining income available for child support, the court must consider all forms of income." *MacKinley v. Messerschmidt*, 814 A.2d 680, 681 (Pa.Super.2002). The term "income" is defined as:

"Income." Includes compensation for services, including, but not limited to,

wages, salaries, bonuses, fees, compensation in kind, commissions and similar items; income derived from business; gains derived from dealings in property; interest; rents; royalties; dividends; annuities; income from life insurance and endowment contracts; all forms of retirement; pensions; income from discharge of indebtedness; distributive share of partnership gross income; income in respect of a decedent; income from an interest in an estate or trust; military retirement benefits; railroad employment retirement benefits; social security benefits; temporary and permanent disability benefit; workers' compensation; unemployment compensation; other entitlements to money or lump sum awards, without regard to source, including lottery winnings; income tax refunds; insurance compensation or settlements; awards or verdicts; and any form of payment due to and collectible by an individual regardless of source.

23 Pa.C.S. § 4302.

¶ 10 Our Supreme Court has directed that in determining a parent's financial obligation to support his children, "a court must make a thorough appraisal of the [parent's] actual earnings and perquisites, ...." *Mascaro v. Mascaro*, 569 Pa. 255, 803 A.2d 1186, 1194 (2002). In *Mascaro*, the perquisites at issue were automobiles, car phones, fuel expenses and automobile insurance, which the Supreme Court held would normally be included in income.[3] In *Diament v. Diament*, 816 A.2d 256 (Pa.Super.2003), this Court discussed the trial court's duty to include in a calculation of a party's income available for support the income attributable to perquisites received

**3.** Because both spousal and child support were at issue in *Mascaro* and the mother (obligee) benefited from the perquisites to the same extent as did the father (obligor), the Supreme Court held that there was no abuse of discretion in not requiring the perquisites at issue to be included as income.

from the party's employer. *See also Portugal v. Portugal,* 798 A.2d 246, 252 (Pa.Super.2002) (stating that "only non-voluntary retirement payments are properly excludable from a parent's net monthly income"); *DeMasi v. DeMasi,* 366 Pa.Super. 19, 530 A.2d 871, 879 (1987) (holding that it was not an abuse of discretion to add the net value of various perquisites to the husband's net income).

¶ 11 Father has not cited any cases that support his contention that the exclusion of perquisites is limited to self-employed persons or to specific types of perquisites. Moreover, Father indicates in his brief that he makes no contribution to his retirement plans. If in fact Father was required to make contributions in order to be eligible for the perquisites he received from his employer, it was his obligation to provide this information to the court, which he did only with regard to his health insurance premiums. That information was evidenced in the adjustment decreasing by $11.98 his gross monthly share of support. Without any other evidence that the inclusion of the value of the perquisites is not income for support purposes, we conclude that the trial court did not abuse its discretion by including the employer's stated value of the benefits as income to Father.

¶ 12 Next, Father argues that the court erred in including the interest from his annuity as income available for support by relying on the designation of annuity in the definition of "income" found at 23 Pa. C.S. § 4302. Father also attempts to distinguish the two cases relied on by the trial court, namely *Portugal* and *MacKinley.* Father recognizes that in *Portugal* the husband's voluntary contribution to his 401(k) plan and the employer's matching contribution were considered income if the employee could access the funds regardless of penalties. The distinction Father

makes is that he neither makes contributions, nor does he withdraw any sums from the annuity. Therefore, he contends that the children have not been deprived of income available for support but may be deprived of a significant future inheritance. Similarly, Father asserts that this Court in *MacKinley* expressed its concern that an obligor could shield income to deprive the children of support, but that that is not an issue in this case.

¶ 13 Although the substance of Father's arguments is well taken, we are compelled to conclude that the trial court properly determined that the interest from the annuity is income available for support as defined in section 4302. Not only is income from an annuity listed within the definition of "income" in the statute, this income falls within the catchall phrase that income constitutes "any form of payment due to and collectible by an individual regardless of source." 23 Pa.C.S. § 4302. It is not a question of whether Father accesses this income, but whether he is entitled to access it. *MacKinley,* 814 A.2d at 684. Because he could access this income, his "children should presently reap the benefit of the investment." *Portugal,* 798 A.2d at 253. Thus, we conclude that the trial court correctly included the interest from the annuity in calculating Father's income, regardless of whether or not he accesses that income.

¶ 14 With regard to the third issue presented, Father again contends that the court erred by including the value of his benefit package and his annuity interest in his actual income. As a result of the inclusion of these items, he argues that the support order increases Mother's annual net income by $26,244, and reduces his actual annual net income to $47,185, thus, creating a situation in which Mother enjoys a better financial circumstance than she did during the marriage. Father re-

lies on pre–1989 case law that provides for a court's consideration of the reasonable needs of the children and the financial resources and reasonable living expenses of the parents. These cases pre-dated the adoption of the statewide support guidelines and, therefore, offer little in the way of addressing any deviation from the guidelines.

¶ 15 Father's argument essentially encompasses what has been termed a *Melzer*[4] analysis, which applies when the parties' combined net income exceeds $15,000 per month. Here, the total net income of the parties is just under the $15,000 cut off, and, accordingly, the court applied the support guidelines without objection by either party. The court in *Mascaro* discusses the statutory basis for the guidelines, recognizing that they are based on "the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support." *Mascaro*, 803 A.2d at 1189 (quoting 23 Pa.C.S. § 4322(a)). The statutory provision further states that "[i]n determining the reasonable needs of the child or spouse seeking support and the ability of the obligor to provide support, the guideline[s] shall place primary emphasis on the net incomes and earning capacities of the parties, with allowable deviations for unusual needs, extraordinary expenses and other factors, such as the parties' assets, as warrant special attention." *Id.* Moreover, "[a]n

award of child . . . support determined under the support guidelines is a rebuttable presumption, from which the trier of fact may deviate under certain circumstances." *Id.* at 1191. The reasons for the deviation must be in writing and based upon consideration of factors listed in Pa.R.C.P. 1910.16–5(b).[5] *Id.*

¶ 16 Although Father argues that the court should have considered the children's reasonable needs and the parties' resources and living expenses, he provides no citations to case law to support this argument. "The rules make clear that the amount of support as determined from the support guidelines is presumed to be the appropriate amount of support. . . ." *Elias v. Spencer*, 449 Pa.Super. 359, 673 A.2d 982, 984 (1996). Having failed to assert a basis upon which the trial court could have relied to deviate from the guidelines, Father cannot now complain that this should have been done. Without evidence that would show that any special obligations or circumstances justified a lowering of the guideline amount, the trial court's decision must be upheld.

¶ 17 Father's last issue concerns the trial court's failure to assign to Mother an earning capacity that is higher than the income she is presently earning. The trial court explained as follows its reasons for determining that her actual income equals her earning capacity:

4. *Melzer v. Witsberger*, 505 Pa. 462, 480 A.2d 991 (1984).

5. Pa.R.C.P. 1910.16–5(b) provides:
    (b) In deciding whether to deviate from the amount of support determined by the guidelines, the trier of fact shall consider:
    (1) unusual needs and unusual fixed obligations;
    (2) other support obligations of the parties;
    (3) other income in the household;
    (4) ages of the children;
    (5) assets of the parties;
    (6) medical expenses not covered by insurance;
    (7) standard of living of the parties and their children;
    (8) in a spousal support or alimony pendente lite case, the period of time during which the parties lived together from the date of the marriage to the date of final separation; and
    (9) other relevant and appropriate factors, including the best interests of the child or children.

With regard to Father's allegation that Mother's earning capacity exceeds her actual income, a person's earning capacity is defined not as an amount which a person could theoretically earn, but as that amount which the person could realistically earn under the circumstances, considering his or her age, health, mental and physical condition, training, *Riley v. Foley,* 783 A.2d 807, 811 (Pa.Super.2001), and the amount of time that the person, during the marriage, had been out of work. *Adams v. Adams,* 387 Pa.Super. 1, 563 A.2d 913, 916 (1989). Due to the close spacing and needs of the parties' young children, as well as the parties' relocation from Iowa to Pennsylvania, Mother's work history was sporadic. During the periods when she worked outside the home during the marriage, most of Mother's employment was part time. Now, at the age of forty-four (44), without the benefit of building toward greater benefits and salary with a long term employer, Mother nevertheless makes more than she ever has in her life. Father presented no evidence to establish that there exists other work available to Mother at a higher salary.

While earning additional money as a night shift employee, Mother's week on/week off schedule maximizes her availability to the needs of the children and eliminates the cost of child care during the weeks when she has custody, thus lessening the support obligations of Father. *Isralsky v. Isralsky,* 824 A.2d 1178, 1190 (Pa.Super.2003). Mother's thirty-six (36) hour average work week, in fact exceeds the thirty-five (35) hour work week upon which Father's salary is based. Consequently, for all of the foregoing reasons, including Mother's need to find suitable employment within a short amount of time following Father's separation from the marital residence,

this Court concludes that Mother's actual income equals her earning capacity. T.C.O. at 7–8. We find no error by the trial court, and conclude that its opinion accurately disposes of Father's final issue concerning Mother's earning capacity. Therefore, we adopt this portion of the trial court's opinion as our own.

¶ 18 Based upon the foregoing, we conclude that the trial court did not abuse its discretion in determining Father's support obligation for his children and, therefore, affirm the trial court's order of support.

¶ 19 Order affirmed.